# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 15-1138


**STATE IN THE INTEREST OF D.E.C. & N.H.C.**



**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. JU 6150
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## SHANNON J. GREMILLION
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Billy Howard Ezell, Shannon J. Gremillion, and David Kent Savoie, Judges.


                                                          **AFFIRMED.**




**Jane Hogan**
**Public Defender's Office, Fifteenth Judicial District**
**600 Jefferson Street, Suite 902**
**Lafayette, LA 70501**
**(337) 232-9345**
**COUNSEL FOR APPELLANT:**
    **J.C. (father)**
**Diane E. Cote**
**825 Kaliste Saloom Road**
**Brandywine III, Room 150**
**Lafayette, LA 70508**
**(337) 262-5913**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana,**
    **Department of Children & Family Services**

**Chantel Conrad**
**Acadiana Legal Services**
**1020 Surray St.**
**Lafayette, LA 70501**
**(337) 237-4320**
**COUNSEL FOR APPELLEE:**
     **D.E.C. (child)**
     **N.H.C. (child)**

**Lucy Melancon**
**Indigent Defender's Office**
**P. O. Box 252**
**Crowley, LA 70527**
**(337) 889-5672**
**COUNSEL FOR APPELLEE:**
     **H.L. (mother)**

**GREMILLION, Judge.**

The father, J.C., appeals the trial court's ruling terminating his parental rights to his children D.E.C., born November 5, 2004, and N.H.C., born November 11, 2005[1][2]

## FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to an October 2013 instanter order, D.E.C. and N.H.C. were removed from J.C.'s grandparents' home, where J.C. had been residing, and placed in the State of Louisiana, Department of Children and Family Social Services' custody (DCFS). The children were adjudicated in need of care and were placed in foster care with their maternal aunt, G.F. The grandparents kicked J.C. out of their home due to his ongoing drug use and because they could no longer care for the children. J.C. was arrested on October 25, 2013 on domestic violence charges and, at that time, tested positive for cocaine, marijuana, and opiates.

As in all cases in which DCFS has taken custody, a comprehensive and detailed case plan was created for J.C. setting forth requirements for reunification pertaining to housing, food, basic needs, the physical and mental health of the parent, parental substance abuse, and the physical and mental health of the children, among other things. Routine review hearings were held to apprise the trial court of the status of the children and parents. DCFS filed a petition for termination of parental rights and certification for adoption on May 28, 2015. Following a termination hearing on September 16, 2015, J.C.'s parental rights were terminated

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, initials are used throughout to protect the identity of the minor.

[2] The mother stipulated to the termination of her parental rights at the same hearing.

in a judgment filed October 6, 2015, and the children were freed for adoption. J.C. now appeals and assigns as error:

1. The juvenile court erred in terminating the parental rights of J.C. under La.Ch.C. art. 1015(4) because J.C. did not abandon his children because he did not demonstrate an intention to permanently avoid parental responsibilities.

2. The juvenile court erred in terminating the parental rights of J.C. under La.Ch.C. art. 1015(5) because the agency failed to show by clear and convincing evidence that J.C. had failed to substantially comply with his case plan, that there was no reasonable likelihood of compliance in the near future, and that termination was in the best interest of the children.

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate his rights. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to those of the parent. *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical,

emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

The trial court's decision to terminate parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *In re V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(4) sets forth the following as grounds for termination of a parent's rights to his children:

Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parents continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

Louisiana Children's Code Article 1015(5) sets forth another ground for involuntary termination of a parent's rights to his children:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

The evidence at trial included DCFS's records and testimony of various witnesses. DCFS's paper trail documenting this case includes the following highlight of events:

- **January 13, 2013 hearing**: continued custody with DCFS

- **March 31, 2014 hearing**: continued custody with the State; reunification with the parent(s) remained the goal. Neither parent attended the hearing. The status report to the trial court stated:

4

In order for [J.C.] to be reunified with his children, [D.E.C.] and [N.H.C.], he will need to demonstrate the ability to care for them, by establishing and maintaining adequate housing, completing an assessment with a local substance abuse clinic and follow the treatment recommendations if there are any. [J.C.] will also need to follow the scheduled visitation contract, participate and complete a parenting class approved by the agency and pay monthly parental contribution to help pay for the cost to care for [D.E.C.] and [N.H.C.] while they are in foster care.

[J.C.] states he is working but he has not provided worker with check stubs verifying his employment and he has not been available for monthly home visits. [J.C.] is residing with his mother in low-income housing for elderly and disabled individuals. On January 15, 2014, [J.C.] tested positive for opiates. [J.C.] was referred to the Nurturing Parenting Program for parents in Substance Abuse Treatment and Recovery through Gulf Coast Teaching Family Services. [J.C.] was terminated from [the] parenting program for not attending. He has not addressed his substance abuse issues and he has not paid monthly parental contributions. [J.C.] has visited his children one time since they entered foster care.

- **October 13, 2014 hearing**: J.C.'s counsel indicated that he was working offshore. The status report to the trial court stated:

  [J.C.] states he is working but he has not provided worker with check stubs verifying his employment and he has not been available for monthly home visits. The agency does not know where [J.C.] is residing. On January 15, 2014, [J.C.] tested positive for opiates. [J.C.] was referred to the Nurturing Parenting Program for parents in Substance Abuse Treatment and Recovery through Gulf Coast Teaching Family Services. [J.C.] was terminated from [the] parenting program for not attending. He has not addressed his substance abuse issues and he has not paid monthly parental contributions. [J.C.] has visited his children one time since they entered foster care.

At this time, it was noted that the children were placed in a certified foster home because the maternal aunt requested that the children be removed in May 2014 due to her impending divorce.

- **January 14, 2015 hearing**: At this time the goal was changed to adoption. The status report to the court stated:

  HOUSING/EMPLOYMENT
  [J.C.'s] last known address was XXXXXX, Basile, LA. At this time the agency does not know whereabouts of [J.C.]. [J.C.] stated he was working at Wolverine Industries but he has not provided worker with

check stubs. [J.C.] has not provided verification of parental contributions.

SUBSTANCE ABUSE
On January 15, 2014 [J.C.] tested positive for opiates. He has not addressed his substance abuse issues. [J.C.] was able to be reached to discuss a referral for a substance abuse assessment.

PARENTING
[J.C.] was referred to Gulf Coast Social Services for Nurturing Parenting Program. [J.C.] was terminated from parenting program for not attending. [J.C.] has visited his children one time since they entered foster care.

- **March 25, 2015 hearing**: J.C. did not attend and had no contact with his court-appointed attorney; goal changed to adoption

HOUSING/EMPLOYMENT
[J.C.'s] last known address was XXXXXX, Basile, LA. At this time the agency does not know whereabouts of [J.C.]. [J.C.] stated he was working at Wolverine Industries but he has not provided worker with check stubs.

[J.C.] has not provided verification of parental contributions.

SUBSTANCE ABUSE
On January 15, 2014 [J.C.] tested positive for opiates. He was unable to be reached to discuss a referral for a substance abuse assessment and he has not provided the agency with verification of having completed a substance abuse assessment and/or treatment.

PARENTING
[J.C.] was referred to Gulf Coast Social Services for Nurturing Parenting Program. [J.C.] was terminated from parenting program for not attending. [J.C.] has visited his children one time since they entered foster care.

In the May 2015 petition for termination, DCFS cited La.Ch.Code art. 1015(4) and (5) as the reasons why J.C.'s parental rights should be terminated because he failed to attend visitation; failed to comply with the required program of treatment and rehabilitation services; is incapable of parenting due to his substance abuse; he failed to contribute to the costs of the children's care; there was no substantial improvement in redressing the problems; he is unable to provide

an adequate home for the children; and the conditions that led to the children's removal persist.

- **June 17, 2015 hearing**:  No appearance by J.C.  Adoption is the goal. Status is identical to the March 25, 2015 hearing.

- **September 16, 2015 termination hearing**:  The status report to the court stated:

  HOUSING/EMPLOYMENT
  The Acadia Parish DCFS Office was contacted by the Evangeline Office July 21, 2015; stating [J.C.] informed them he had a case with the Acadia Parish office.  Evangeline Parish worker verified the reason they had contact with [J.C.] was due to the open case regarding his younger three children in their parish.  At that time, the agency was provided with [J.C.'s] current address.  [J.C.'s] younger three children came into care on July 21, 2015 due to dependency.

  On July 30, 2015, agency visited [J.C.'s ] house.  He resides with his live in girlfriend (and mother of his youngest three children] in a three bedroom one bathroom home in Basile La.  According to the couple, they have been residing in this home since January of 2015.  The lease the couple provided stated they have resided in the home since March of 2015.  [J.C.] provided verification that he has worked for L and L sandblasting in Eunice, La.

  [J.C.] has not provided verification of parental contributions for the life of the case plan.

  SUBSTANCE ABUSE
  [J.C.'s] last drug screen was on July 16, 2015 and he tested positive for Amphetamines, Marijuana, and opiates.  [J.C.] submitted to this screen as a result of the investigation in Evangeline Parish.  He did not make contact with the agency regarding [N.H.C.] and [D.E.C.] until the new investigation began for his younger children.

  PARENTING
  [J.C.] was referred to Gulf Coast Social Services for Nurturing Parenting Program.  [J.C.] was terminated from parenting program for not attending.  He has visited with his children one time since they entered foster care.

Exhibits admitted into evidence from Gulf Coast Social Services confirm that J.C. did not attend any of the scheduled parenting classes.  Ville Platte Behavioral Health had no records on J.C.  J.C. submitted to three drug tests during

the pendency of the case. Drug testing reports submitted into evidence showed J.C.'s status on February 15, 2013, as negative; January 15, 2014 negative from a urine test, but a hair test from the same day indicated a positive result for opioids; and July 16, 2015 positive for amphetamines, cannabinoids, and opiates.

Testimony elicited from the September 16, 2015 hearing included that of Keisha Benoit, Kimberly Blair, and J.C. Benoit, who was the case worker until December 2014, testified that the children came into DCFS's care because of neglect due to abandonment and substance abuse issues. She testified that the primary aspects of J.C.'s plan included substance abuse treatment, securing adequate housing, parental contributions, and visitation with the children. Benoit said that J.C. never provided proof of stable housing and that she had trouble contacting J.C. She said that she resorted to sending letters to his mother's house. J.C. never provided proof of employment, but Benoit said that she was able to contact his employer and confirm his employment for most of the year. She further said that J.C. did not provide any proof of parental contributions. Benoit testified that J.C. never attempted to receive the required substance abuse treatment. She further stated that J.C. did not attend the parenting classes, even though DCFS would have provided transportation to the classes which would have been scheduled around J.C.'s work schedule. Benoit testified that J.C. only visited with his children two times (once at the DCFS office and the other at the foster parents' house) over the course of her involvement with his case plan.

Blair, who was the caseworker from January 2015 until the time of the hearing, testified that she learned of J.C.'s address on July 21, 2015, only because the Evangeline Parish DCFS opened up a case on his three younger children. Blair said she had no contact with J.C. until the removal of his three younger children.

Blair said she tried to contact J.C. by visiting his mother, but his mother failed to inform her that J.C. was living down the street. Instead, the mother often said that J.C. was working offshore. Blair reviewed three letters that were sent certified to J.C.; two at his mother's house and signed for by his mother, and one which his girlfriend signed for at his address. The letters indicated all the parts of the case plan that J.C. still needed to complete.

Blair said that the records only indicate one December 2013 visit by J.C. He did not make any parental contributions for the life of the case or attend parenting classes. J.C. was also required to complete a Family Violence Intervention Program as part of his probation relating to his domestic violence charges; however, a revocation hearing was scheduled for December 17, 2015, because J.C. provided no proof that he attended the program. Blair was never contacted by J.C. from the time she took over the case in January 2015 through July 2015, when his other three children came into DCFS's care.

Blair said the children are doing extremely well in their foster home. D.E.C. and N.H.C. are both doing well in school, achieving honor roll status. They are also involved in T-ball, baseball, Girl Scouts, Cub Scouts, and church activities. Blair testified that both children wish to be adopted by their foster parents.

On cross-examination, Blair admitted that J.C. had recently been compliant with the housing and employment requirements of his plan. However, J.C. never informed DCFS of his stable housing, and DCFS was under the impression that he continued to reside with his mother.

J.C. testified that he had been living at his current address for nearly a year. He said that he called the DCFS offices and left messages, but they denied receiving them due to problems with the voicemail messaging system. However,

J.C. said that he usually tried calling the foster mom (the maternal aunt) rather than DCFS. J.C. claimed to have visited with his children four times while they were in this foster home; twice at Burger King and twice at the maternal aunt's residence. J.C. then said that he did not attempt to contact his caseworker because he was talking directly to the foster mom. J.C. claimed his mother did not give him any of the certified mail sent by DCFS until recently because she forgot. J.C. had been employed at L & L Sandblasting for three months.

Regarding his positive drug screen in January 2015, J.C. said he did not have a prescription for the medication but had taken it because he had a toothache and could not afford to go see a dentist. However, he said he had been prescribed painkillers for the five or six teeth he had pulled.

J.C. said he did not visit his children more often because he did not have any transportation. However, he had not requested any transportation within the previous year. Regarding the financial contributions required of the plan, J.C. said that he gave money orders to the foster mom, who refused them. J.C. claims that he then told the foster mother "go ahead and send them. You got them over there, go ahead and send them to Baton Rouge." He admitted he had provided no evidence of the money orders to DCFS. J.C. said he had completed four out of twelve of the Family Violence Intervention Program classes and was scheduled to attend another the next day. He admitted he had not attended any parenting classes, claiming that a lack of transportation prevented him from doing so. J.C. admitted that he was aware that he had to obtain substance abuse referrals and a mental health assessment but said that he did not do so because he lacked transportation because he was laid off and "living from house to house."

J.C. said he desired to have custody of D.E.C. and N.H.C. and believed he could now complete his substance abuse assessment, mental health assessment, provide clean drug screens, and complete parenting classes. When questioned if there was anything else he would like to tell the trial court as to why he did not want his rights terminated, J.C. stated:

> I really don't want my rights terminated. I'd like to have – I wasn't able at the time of the first two (2), I wasn't stable, I was messed up. I've straightened up a lot. And with the prior case, I was the one that called OCS personally to let them know what was going on and let them know I had my kids and they respond. I gave them to their grandmother temporarily because I didn't want them around to see none of that stuff. And with the drug screen and the hair follicle and the piss test, the drug screen, I had passed it. It was the hair follicle was the only thing that come up dirty.

Shortly thereafter, J.C. admitted that if he were to be drug-tested that day, it would come back positive for prescribed Xanax and Lortabs and Percocet for which he had no prescription. The following colloquy then ensued:

> Q. Your children, two (2) children, these two (2) children, [D.E.C.] and [N.H.C.], came into care because of your drug use. And two-and-a-half (2 ½) years later you are still using drugs that are not prescribed you.
>
> A. Yes, ma'am; okay.

We find little analysis is required to affirm the termination of J.C.'s rights to his children subject to this appeal. J.C. utterly failed to address any of the issues warranting the removal of his children and, in fact, was under the influence of drugs at the time of trial. The three subsequent children born to J.C. and his girlfriend are also in DCFS's care. J.C. has repeatedly shown that he is unable to meet the most basic needs of the children in his care, and there is no reasonable expectation that this will change anytime in the near future. J.C., at most, visited with his children four times over the course of a two-year period. He did not

11

attend parenting classes, did not make parental contributions, did not obtain assistance with his substance abuse issues, and did not maintain contact with the agency. J.C.'s excuse of "lack of transportation" is simply insufficient and not credible, particularly in light of the fact that DCFS offered to transport J.C. The children have been in the DCFS's care for over two years. The best interests of these children demand that a permanent, stable home be afforded to them, and J.C. has demonstrated, time and time again, that he will be unable to meet those demands. We find no manifest error in the trial court's ruling terminating J.C.'s parental rights to his children in accordance with La.Ch.Code art. 1015(4) and (5). Accordingly, there is no merit in J.C.'s assignment of error.

## CONCLUSION

The judgment of the trial court terminating J.C.'s parental rights to his children, D.E.C. and N.H.C., is affirmed. All costs of this appeal are assessed against J.C.

**AFFIRMED**.